REUBEN LOREDO, AND J. FRANK WOOD, JR., AS GUARDIAN AD LITEM OF STACEY JAZMINE LOREDO, AND THOMAS BERKAU, AS ADMINISTRATOR OF THE ESTATE OF HENRY LOREDO, MINOR/DECEASED, AND AMELIA TORRES, ADMINISTRATRIX OF THE ESTATE OF VICTORIA TORRES, PLAINTIFFS v. CSX TRANSPORTATION, INC., NORFOLK SOUTHERN CORPORATION, NORFOLK SOUTHERN RAILWAY COMPANY, D.A. GILBERT, DEFENDANTS-THIRD-PARTY PLAINTIFFS v. AMELIA TORRES, AS ADMINISTRATRIX OF THE ESTATE OF VICTORIA TORRES, FAMILY HOME & GARDEN, INC. (F/K/A FAMILY FARM SUPPLY, INC.), WALTER B. HORNE AND WIFE, JANET G. HORNE, INDIVIDUALLY AND DBA FAMILY EGG MARKET, THIRD-PARTY DEFENDANTS

No. COA04-111

(Filed 5 April 2005)

### Railroads— crossing accident—Amtrack train—warnings and unobstructed view—no negligence

Summary judgment was affirmed for plaintiffs in a railroad crossing case where the evidence did not create a genuine issue of fact as to whether defendants had a duty to maintain gates or other mechanical warnings. The trial judge found as a matter of law that the conditions existing at the crossing did not render it peculiarly and unusually hazardous; while plaintiffs point to the surprise of a train approaching at between 65 and 70 miles per hour when other trains approached at less than 10 miles per hour, the variable speeds of other trains is not a condition existing at

**LOREDO v. CSX TRANSP., INC.**

[169 N.C. App. 508 (2005)]

the crossing at the time a motorist must determine whether a train is approaching. Defendants' duty is to warn a motorist of an approaching railroad crossing and train, and that duty is met when a motorist stopped safely behind a stop sign at the crossing has an unobstructed view of an approaching train.

Judge HUDSON concurring in part and dissenting in part.

Appeal by plaintiffs from judgments entered 20 December 2002 by Judge Jack W. Jenkins and 26 June 2003 by Judge Henry W. Hight, Jr. in Wake County Superior Court. Heard in the Court of Appeals 2 November 2004.

*Mast, Schulz, Mast, Mills, Stem, & Johnson P.A., by Charles D. Mast, George B. Mast, and David F. Mills, and Ward & Smith, P.A., by W.L. Allen, III, and E. Bradley Evans, for plaintiffs-appellants.*

*Millberg, Gordon & Stewart, P.L.L.C., by Frank J. Gordon, and Bode, Call & Stroupe, L.L.P., by Odes L. Stroupe, Jr., for defendants-appellees.*

*Robert E. Ruegger for third-party defendant Amelia Torres.*

*Cranfill Sumner & Hartzog, L.L.P., by Patrick H. Flannagan and George L. Simpson, IV, for third-party defendant Family Home & Garden, Walter B. Horne and Janet G. Horne.*

*North Carolina Academy of Trial Lawyers, by John J. Korzen, amicus curiae.*

ELMORE, Judge.

This action arises out of a collision between an Amtrak train and a motor vehicle at a railroad grade crossing located off of Hillsborough Street between Raleigh and Cary. The crossing runs over two main line railroad tracks and provides access to two businesses located on the other side of the tracks. At approximately 4:34 p.m. on the afternoon of 25 April 1998, Victoria Torres was driving a van with her two children as passengers, Henry and Jazmine Loredo, when she attempted to cross over the tracks and was struck by the approaching train. Ms. Torres and Henry were killed by the collision, and Jazmine was severely injured.

The crossing was controlled and maintained by defendants CSX Transportation, Inc. (CSX) and Norfolk Southern Corporation and

Norfolk Southern Railway Company (Norfolk Southern).[1] A white stop bar was painted on the road and a stop sign and crossbucks sign were in place at the crossing where the van was traveling south to north. The Amtrak train was traveling east to west at a speed of approximately 68 miles per hour when it collided with the van's right side. Defendants' evidence showed that the train blew its horn for 21 seconds prior to the collision and that the driver's side window on the motorist's vehicle was rolled down at the time of the collision.

Plaintiffs Reuben Loredo, J. Frank Wood, Jr., Guardian *ad litem* of Jazmine Loredo, and Thomas Berkau, Administrator of the Estate of Henry Loredo, filed two separate negligence actions, one in Wake County and one in Johnston County Superior Court, on 22 February 2000. Plaintiff Amelia Torres, Administratrix of the Estate of Victoria Torres, filed a negligence action in Wake County Superior Court on 24 April 2000. On 20 December 2002, Judge Jack W. Jenkins granted summary judgment against plaintiffs in one of the actions on their claim for punitive damages. The three actions were consolidated on 23 April 2003, and the parties have stipulated that all pleadings, motions, discovery and orders entered into in one action are binding in the other two actions. In an order entered 26 June 2003, the trial court granted summary judgment to defendants as to all of plaintiffs' claims.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. §1A-1, Rule 56(c) (2003); *DiOrio v. Penny*, 331 N.C. 726, 728, 417 S.E.2d 457, 459 (1992). The record is reviewed in the light most favorable to the non-movant, and all inferences are drawn against the movant. *Caldwell v. Deese*, 288 N.C. 375, 378, 218 S.E.2d 379, 381 (1975). The trial court does not resolve issues of fact and must deny a motion for summary judgment if there is a genuine issue as to any material fact. *Ragland v. Moore*, 299 N.C. 360, 363, 261 S.E.2d 666, 668 (1980).

In North Carolina, railroad companies have a duty " 'to give to users of the highway warning, appropriate to the location and circumstances, that a railroad crossing lies ahead.' " *Collins v. CSX Transportation*, 114 N.C. App. 14, 18, 441 S.E.2d 150, 152 (quoting

---

1. The North Carolina Railroad owns the underlying right of way at the crossing, but has entered into lease agreements with defendants Norfolk Southern and CSX.

*Cox v. Gallamore*, 267 N.C. 537, 541, 148 S.E.2d 616, 619 (1966)), *disc. review denied*, 336 N.C. 603, 447 S.E.2d 388 (1994). Automatic warning devices, such as gates or flashing lights, are required only at crossings " 'so dangerous that prudent persons cannot use them with safety unless extraordinary protective means are used.' " *Price v. Railroad*, 274 N.C. 32, 46, 161 S.E.2d 590, 600 (1968) (internal quotation omitted). Thus, a railroad company is negligent in failing to maintain an automatic alarm only when the crossing is more than ordinarily hazardous[2], such as where the view at the crossing is obstructed. *Id.* This is so because "[a] railroad company is not an insurer of the safety of travelers, and it is not required to maintain a foolproof crossing or a crossing where no injury is possible." *Id.* at 39, 161 S.E.2d at 595.

In the instant case, the trial judge found as a matter of law that the conditions existing at the crossing did not render it "peculiarly and unusually hazardous." In considering the motion for summary judgment, the trial court reviewed extensive deposition testimony by experts for both parties. Plaintiffs' own expert, Archie Burnham, testified that the sight distance to the east from the stop bar was at least 1500 feet and that this sight distance was satisfactory. Also, defendants presented as exhibits two enlarged photographs of the crossing to illustrate the sight distance available on a clear day. Exhibit 2, which is referenced in the court's order, shows the view from a vehicle at the stop sign of an approaching train 1800 feet from where the collision occurred. The trial judge concluded as follows:

> According to the plaintiffs' own evidence and the undisputed details of Exhibit 2 described above, there is no genuine issue of material fact in this case as to the available sight distance at this crossing from a safe place (behind the stop bar and stop sign) on the day of the accident. The photographs and the referenced testimony from the plaintiffs' own retained expert witness establish that there was a safe point from which the plaintiff could have looked for a train and traveled over this railroad crossing safely. Thus, as a matter of law, this Court finds that this crossing was not "peculiarly and unusually hazardous[.]"

Plaintiffs contend that there were genuine issues of material fact in dispute and that the issue of whether the crossing was peculiarly and unusually hazardous should have been submitted to the jury.

---

2. The terms "more than ordinarily hazardous" and "peculiarly and unusually hazardous" are used interchangeably throughout the cases discussed herein.

Plaintiffs argue that the trial court erred in considering only sight distance, rather than all the conditions at the crossing. Specifically, plaintiffs point out that the surprise of a train approaching at between 65 and 70 miles per hour when other trains approach at less than 10 miles per hour may create an extraordinarily dangerous crossing.

Our Supreme Court has stated that the inquiry into whether a crossing is peculiarly dangerous focuses on "the conditions existing at or about the crossing." *Caldwell v. R.R.*, 218 N.C. 63, 70, 10 S.E.2d 680, 684 (1940). The Court described certain conditions that would show a crossing presents a peculiar danger:

> that it is a thickly populated portion of a town or city; or, that the view of the track is obstructed either by the company itself or by other objects proper in themselves; or, that the crossing is a much traveled one and the noise of approaching trains is rendered indistinct and the ordinary signals difficult to be heard by reason of bustle and confusion incident to railway or other business; or, by reason of some such like cause.

*Id.* at 69, 10 S.E.2d at 683 (quoting *Batchelor v. R.R.*, 196 N.C. 84, 87, 144 S.E. 542, 543 (1928)). Thus, plaintiffs are correct in that the motorist's view of the tracks is not the only condition a factfinder may consider in determining whether a crossing is more than ordinarily hazardous. However, the variable speeds of other trains, e.g., a freight train as compared to a passenger train, is not a condition existing at the crossing at the time when a motorist must discern whether a train is approaching. Indeed, no case in North Carolina has recognized varying speeds of different trains as a factor bearing upon the degree of danger presented by conditions at a crossing. In contrast, our Supreme Court has consistently held obstructed view to be a material factor in analyzing the reciprocal duties of the railroad and a motorist at a grade crossing. *See, e.g., Johnson v. R.R.*, 257 N.C. 712, 127 S.E.2d 521 (1962) (nonsuit improper where evidence showed box cars partially obstructed motorist's view down tracks); *Neal v. Booth*, 287 N.C. 237, 214 S.E.2d 36 (1975) (directed verdict improper where motorist's view obstructed by a building and railroad cars); *Mansfield v. Anderson*, 299 N.C. 662, 264 S.E.2d 51 (1980) (jury question where view severely obstructed by vegetation until motorist came within few feet of tracks such that motorist did not have safe position from which to look and listen).

Here, the evidence presented to the trial court established that the crossing was marked by both a stop sign and stop bar indicating

a safe position to observe approaching trains, and there was an unobstructed view of more than 1,500 feet down the tracks for a motorist stopped behind either the stop sign or stop bar. Even viewed in the light most favorable to plaintiffs, there was no evidence placing the sight distance and unobstructed view into dispute. The record clearly indicates that the trial judge considered the evidence of sight distance at both 16 feet (at stop bar) and 21 feet (at stop sign) from the near rail. Plaintiffs assert that 24 feet from the near rail is also a reasonable point from which to measure the sight distance because the stop sign is 20 feet from the near rail and a driver's head is at least 4 feet behind the front of the vehicle. However, plaintiffs offer no evidence that the sight distance for a motorist stopped 24 feet from the rail is limited and thus are speculating that the sight distance from this point would be inadequate. In sum, plaintiffs failed to present affirmative evidence that the sight distance from behind either the stop bar or stop sign was limited or obstructed to any extent. *Cf. Parchment v. Garner*, 135 N.C. App. 312, 314, 520 S.E.2d 100, 102 (1999) (plaintiff's expert submitted report documenting severe limitations on sight distance caused by trees and vegetation), *disc. review denied*, 351 N.C. 359, 542 S.E.2d 216 (2000); *Collins*, 114 N.C. App. at 16-17, 441 S.E.2d at 155 (evidence that motorist's view partially obstructed by foliage near the tracks); *Dixon v. CSX Transp., Inc.*, 990 F.2d 1440, 1451 (4th Cir.) (ample evidence that obstructed view prevented motorist from being able to look and listen for approaching train without stopping vehicle within 3 or 4 feet of tracks), *cert. denied*, 510 U.S. 915, 126 L. Ed. 2d 252 (1993). It is *undisputed* that a train 1500 feet away from the crossing is visible from a safe point behind either the stop bar or stop sign. The unobstructed view at the crossing permits a motorist to safely observe whether a train is approaching without using extraordinary protective means. Defendants' duty under our common law is to warn a motorist of an approaching railroad crossing and train, and that duty is met when a motorist stopped safely behind a stop sign at the crossing has an unobstructed view of an approaching train. *See Price*, 274 N.C. at 46, 161 S.E.2d at 600.

For the foregoing reasons, we hold that the undisputed evidence in the record before the trial court, considered in the light most favorable to plaintiffs, creates no genuine issue of material fact as to whether defendants had a duty to maintain gates or other mechanical warning and the grant of summary judgment must be affirmed. We do not reach plaintiffs' assignment of error challenging the court's ruling on the punitive damages claim.

LOREDO v. CSX TRANSP., INC.

[169 N.C. App. 508 (2005)]

Affirmed.

Chief Judge MARTIN concurs.

Judge HUDSON concurs in part and dissents in part.

HUDSON, Judge, concurring in part and dissenting in part.

The majority here affirms the grant of summary judgment to the defendants/third-party plaintiffs (the Railroad defendants). I agree with much of the majority's analysis of the applicable legal standard, but I believe that the forecast of evidence raises genuine issues of material fact as to whether the crossing was "more than ordinarily hazardous." Thus, I respectfully dissent.

As the majority notes, "[i]n North Carolina, railroad companies have a duty 'to give to users of the highway warning, appropriate to the location and circumstances, that a railroad crossing lies ahead.' " *Collins v. CSX Transportation*, 114 N.C. App. 14, 18, 441 S.E.2d 150, 152 (1994) (other citations omitted). I agree with the majority that "a railroad company is negligent in failing to maintain an automatic [warning device such as gates or lights] only when the crossing is more than ordinarily hazardous." (citing *Price v. Seaboard R.R.*, 274 N.C. 32, 46, 161 S.E.2d 590, 600 (1968)).

The parties presented a forecast of evidence in several forms, including numerous depositions, sworn answers to discovery, affidavits and photographs, *inter alia*. The majority makes little mention of plaintiff's forecast of evidence, which includes the expert depositions of Anand David Kashbekar, who visited the crossing and created a computer model to evaluate the crossing. Below are some excerpts from his testimony that, in my view, create an issue of fact as to whether the conditions at the crossing are more than ordinarily hazardous:

A: I was taking some measurements of the track and—and the train came out of the—the east early in the morning.

Q: Okay. What did you observe about it?

A: It caught me by surprise a little bit, I heard—I was on the tracks, I heard the whistle and at that time of the morning if you look to the east that time of year you're looking straight into the sun . . . . It wasn't but a few seconds later that the train crossed over that crossing.

A: I've been out there other times either taking photographs, measurements and I've seen not a passenger train, but the freight trains go by there at probably as little as three or four miles per hour, walking pace. So, you know, what I gather from that is, is the crossing is used by trains at various rates of speed.

* * * * *

Q: Any of those observations about the train movements that day have anything to do with your opinions or your computer model in this case?

A: No. Well certainly it leads me—it makes me understand how this type of accident can happen. If a person is conditioned to seeing a train come there at a few miles per hour and then all of a sudden they are going across the crossing, you got one approaching at almost seventy miles an hour, it's a huge difference to contend with. Early in the morning obviously it's almost—on the days I was out there, it was virtually impossible to see a train coming from the East until it's right up on top of you . . . . [A] driver may think that he or she has a reasonable opportunity to cross the crossing and starts to do so and the next thing he or she knows is a train is right up on them.

* * * * *

A: Assuming the train is going from east to west, she's approaching from the south, heading north. If you're looking over toward the east, you've got a hillside there, you've got crossbucks and other obstructions and—and it's clear to me that at that approach rate [of the train] it's difficult to reliably cross that crossing in a safe manner.

* * * * *

A: The only thing I'll tell you, the day I was out there I heard a train whistle. I looked both directions and I couldn't see a train and I didn't bother to get off the tracks until the tracks started rumbling.

Q: Okay. Because the sun was in your eyes?

A: I didn't see the train and—and you can hear something—I was out of my car on the tracks and to the west I could see there was no train visible to me. To the east I could see a fair amount of

**LOREDO v. CSX TRANSP., INC.**

[169 N.C. App. 508 (2005)]

track, you know, a couple hundred feet in front of me and then I was looking into the sun.

\* \* \* \* \*

A: Yeah, and also you've got a dip in those tracks that start to—to lower the tracks. The tracks and the bed actually—a section of them will disappear.

\* \* \* \* \*

A: I believe that from this position if you went down the tracks two thousand feet with—with an object that was the size of a train you could tell that there was something down there. Whether or not you could tell whether it was a train, a truck, crossing the other crossing or trees or what—

Q: Right.

A: —is a different story.

Q: How far away—suppose you were standing on flat railroad tracks, that are flat for three miles, looking down the tracks, how far away can you see a train coming and recognize that it's a train, looking straight at it?

A: I—I think there are a lot of variables. It depends on the person, it depends on where the sun is.

\* \* \* \* \*

A: [Y]ou got a double set of rails and it's a particularly hazardous crossing for that reason because you got to contend with two sets of rails and—and here is a situation where somebody may get onto the crossing and a train that's going at a hundred feet per second comes up on her and she's faced with the decision as to whether or not to stop or try to accelerate to get out of the way and that was the—the whole intention.

\* \* \* \* \*

Q: Do you agree that a motorist in North Carolina should look and listen for trains from a—a point at a crossing where looking and listening will be of benefit to them?

A: To the best of their knowledge, yes. But I don't think it's reasonable to expect the average motorist to be able to determine always what that point is.

Q: Okay.

A: They—they have no idea what the train speed is. Most of them don't convert miles per hour to feet per second in their head like we have been doing and that—but that's the reason I think this crossing is particularly hazardous.

Taken in the light most favorable to the plaintiff, these excerpts alone create an issue of fact as to whether the crossing was more than ordinarily hazardous.

However, plaintiff forecast much more evidence than this, tending to show that the circumstances affecting a driver at the crossing could give rise to an unusually hazardous situation. For example, Ernest F. Mallard, a long-time State Department of Transportation Signals Engineer, identified many potential problems facing a motorist at the crossing, including the high volume and speed of train traffic, the double tracks, the proximity to busy Hillsborough Street, the distraction from irregular width and uneven surfaces of Bashford Road, and possible problems seeing down the tracks. In addition to these factors, the sun, dip in the tracks, obstructions, and the potential surprise created by the wide variation in train speeds, noted by Mr. Kashbekar, all could affect a reasonable motorist's ability to judge and cross safely at a given time. Other evidence indicated that there had been at least five previous collisions at this crossing, and James McCloskey of Norfolk and Southern Railway acknowledged that "we knew about dangerous crossings, for example, this crossing."

Thus, I believe that all of the evidence forecast creates issues of fact regarding the conditions under which trains might be viewed, as well as regarding other matters affecting the potentially hazardous nature of the crossing. This testimony, as well as other evidence, also raises genuine issues about other aspects of the conditions that might have existed on the morning of the collision, such that these issues should be for the jury.

I agree with the majority that a motorist's view of the tracks is a material factor in determining whether a crossing is so hazardous that it triggers duties on the part of the railroad. However, in light of the forecast of evidence here, I do not agree that it is "*undisputed* that a train 1500 feet away from the crossing is visible from a safe point," or that sight distance is the only factor to be considered, as the majority implies. In addition, the majority's statements that "the unobstructed view at the crossing permits a motorist to safely observe whether a train is approaching without using extraordinary

protective means," and that "the variable speeds of other trains . . . is not a condition existing at the crossing at the time when a motorist must discern whether a train is approaching," are essentially findings of fact, which should properly be for the jury. The actual issue for the jury, moreover, involves not whether trains of variable speeds were passing at the time of the incident, but rather, whether the history of variable speeds created a peculiarly hazardous condition for the plaintiff's decedent at this crossing. It is well-established that the role of this Court on appeal is not to resolve such disputed issues of fact.

The majority cites several cases in support of its conclusion, but in at least two of those cases, the appeal turned on whether there was evidence of gross negligence, and in *Collins* the issue of liability for the crossing was submitted to the jury. *See Parchment v. Garner*, 135 N.C. App. 312, 520 S.E.2d 100 (1999); *Collins v. CSX Transportation*, 114 N.C. 14, 441 S.E.2d 150 (1994). Similarly, viewing the evidence in the light most favorable to the plaintiff, I believe that we should reverse and remand, so that the case may be tried to the jury.

Accordingly, I would reverse the grant of summary judgment and remand for trial.